# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 24-2212

ADVANCED GYNECOLOGY AND LAPAROSCOPY OF NORTH JERSEY P.C.; AESTHETIC & RECONSTRUCTIVE SURGEONS, LLC; ATLANTIC PEDIATRIC ORTHOPEDICS PA; BERGEN SURGICAL SPECIALISTS P.A.; EAST COAST AESTHETIC SURGERY P.C., *et al.*,
Appellants

v.

CIGNA HEALTH AND LIFE INSURANCE COMPANY; CONNECTICUT GENERAL LIFE INSURANCE COMPANY

_____

Appeal from the U.S. District Court, D.N.J.
Judge Esther Salas, No. 2:19-cv-22234

_____

Before: SHWARTZ, FREEMAN, and RENDELL, *Circuit Judges*
Submitted Jul. 7, 2025; Decided Jul. 13, 2026
_____

NONPRECEDENTIAL OPINION[*]

FREEMAN, *Circuit Judge*.

New Jersey-based healthcare practices appeal the dismissal of their ERISA, RICO, and state law claims against insurance providers. We will AFFIRM the dismissal of the state law claims and most ERISA fiduciary-duty claims. However, when construed in the light most favorable to the plaintiffs, the operative complaint states claims for some ERISA

_____

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

violations, so we will VACATE the dismissal of those claims. We also will VACATE the dismissal of the RICO claims, and we will REMAND this matter for further proceedings.

**I**

Plaintiffs are nearly two dozen New Jersey-based healthcare practices (the "Practices"). The Practices provide out-of-network healthcare services to subscribers of health-insurance carriers Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company (collectively, "Cigna").[1] The Practices allege that Cigna has underpaid them for thousands of out-of-network elective and emergency claims, in violation of the terms of Cigna's insurance plans (the "Plans").[2] Specifically, they claim Cigna was required to reimburse the Practices for covered expenses at the rates specified in the Plans for out-of-network providers. Particularly relevant to those rates is the Maximum Reimbursable Charge ("MRC"), which is used to calculate reimbursements for different types of services the hospitals provided.

1. Elective treatment

For elective treatment, each Plan required Cigna to calculate reimbursement to out-of-network providers based on one of two methods: MRC-1 or MRC-2. Ultimately,

---

[1] "Out-of-network" providers are those that do not have contracts with insurance providers to accept pre-negotiated rates.

[2] When Cigna subscribers seek treatment from the Practices, they "assign their rights to benefits under the Cigna Plans to [the Practices]." App. 91. This means that the Practices may seek reimbursement directly from Cigna, instead of billing the subscribers who would then seek reimbursement from Cigna. *See N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372 (3d Cir. 2015) ("[A]ssignment of the right to payment logically entails the right to sue for non-payment."). Cigna does not argue that any anti-assignment provisions bar this suit.

2

Cigna was required to pay the Practices the relevant MRC value, less any applicable co-insurance, co-payments, or deductibles.

*MRC-1.* Plans utilizing the MRC-1 method for calculating reimbursements include language substantially similar to the following:

> The Maximum Reimbursable Charge for covered services is determined based on the lesser of:
>
> • the provider's normal charge for a similar service or supply;
>
> or
>
> • a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by [Cigna].
>
> The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.

App. 115–16.

The Practices allege, based on preliminary discovery, that the "database selected by Cigna," as referenced in the MRC-1 method, is the FAIR Health database. App. 116.[3] They further allege that all of the MRC-1 plans at issue reimburse out-of-network providers at an amount between the 80th and 100th percentile of the FAIR Health database.

The Practices explain they "typically set their normal charges at or around the 80th percentile of the Fair Health database" so "in most if not all cases, Plaintiffs' normal

---

[3] The Fair Health database uses information from billions of claims to estimate what medical providers charge, and what insurers pay, for providing healthcare to patients.

charges for each service or supply represent the MRC-1 amount." App. 92. Thus, the MRC-1 method should have resulted in reimbursement near the Practices' normal charges. However, for the MRC-1 claims at issue here, reimbursements to the Practices have averaged just 15.2% of their normal charges.

*MRC-2.* Plans using the MRC-2 method use language substantially similar to the following:

> The Maximum Reimbursable Charge for covered services is determined based on the lesser of:
>
> • the provider's normal charge for a similar service or supply;
>
> or
>
> • a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.

App. 117–18. We will refer to this as the "first MRC-2 approach." Those plans also provide a second way to calculate the MRC-2 amount (the "second MRC-2 approach"):

> [I]n some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:
>
> • the provider's normal charge for a similar service or supply;
>
> or
>
> • the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.

App. 118 n.6 (internal quotation marks omitted).

The Practices allege that Cigna has never developed the Medicare-based schedule

4

referenced in the first MRC-2 approach.  Thus, the Practices allege that the MRC-2 method requires reimbursements to be calculated based on their normal charges, less any patient responsibility.  However, for the MRC-2 claims at issue here, reimbursements to the Practices have averaged just 7.5% of their normal charges.  App. 154.

2.  Emergency claims

The Practices also allege that Cigna failed to appropriately reimburse them for emergency treatment that they provided to Cigna subscribers.  The Plans include language substantially similar to the following:

> Out-of-Network Emergency Services Charges
>
> 1.  Emergency services are covered at the In-Network cost-sharing level if services are received from a non-participating (Out-of-Network) provider.
>
> 2.  The allowable amount used in determining benefit payments for covered emergency services provided in the emergency department of a non-participating (Out-of-Network) Hospital is the negotiated amount agreed to by the Out-of-Network provider and Cigna, or if no amount is agreed upon, the greater of the following:
>
>   (i)     the median amount negotiated with In-Network providers for the emergency service (excluding In-Network copay or coinsurance);
>
>   (ii)    the Maximum Reimbursable Charge; or
>
>   (iii)   the amount payable under the Medicare program (not to exceed the provider's billed charges).
>
> The member is responsible for the applicable In-Network cost-sharing amounts. The member also is responsible for all charges in excess of the allowable amount unless a negotiated amount is agreed to by the Out-of-Network provider and Cigna.

5

App. 113.  The Practices allege that the calculation method that "typically results in the greatest amount payable" is the one based on the MRC.  App. 113.  They explain that, as described above, *see supra* pp. 3–5, reimbursement based on the MRC amount typically works out to be reimbursement in the amount of a provider's normal charges.  However, Cigna's reimbursements for emergency services fell short of the Practices' normal charges.

### 3.  Fiduciary duties

The Practices further allege that Cigna violated its ERISA-imposed fiduciary duties of loyalty and due care by engaging in prohibited transactions and acts of self-dealing.  The Practices explain that Cigna "diverted Cigna Plan funds belonging to [the Practices] and used them to pay itself and its third-party [R]epricing [C]ompanies exorbitant 'cost-containment fees.'"  App. 211.  Cost-containment fees are paid to Cigna by the Plans and are 29–35% of "net savings," which is the difference between the amount that a provider is owed under the relevant Plan and the amount the Practices are ultimately paid after negotiations.  App. 184.  Cigna pays the Repricing Companies a commission from the cost-containment fees in exchange for the Repricing Companies having falsely told providers that Cigna Plans pay less than they actually do.  The Practices allege that, because the fees increase with Cigna's savings, they "provide[] an incentive for Cigna and the Repricing Companies to conspire to pay [the Practices] the least amount on a claim to maximize their profits."  App. 185.  The Practices also allege that "Cigna pays itself and the Repricing Companies cost-containment fees irrespective of whether the cost-containment process actually saves the specific Plan any money."

6

App. 185. Thus, it misuses the cost-containment process to profit at the Practices' expense.

Separately from their cost-containment allegations, the Practices allege that Cigna unlawfully used Plan funds for its own benefit in various ways, including by investing funds that it owed to the Practices in an interest-bearing bank account. App. 211.

4. RICO

The Practices also allege that, since at least 2013, Cigna engaged in a pattern of racketeering in which it repeatedly used the mails and wires in furtherance of four separate, but related, schemes to defraud. Those schemes involved deceiving the Practices and Cigna Subscribers into believing that:

> (a) Plaintiffs are in-network and that Plaintiffs' claims should therefore be processed as in-network claims; (b) Plaintiffs' claims submitted to Cigna for reimbursement should be paid at deeply discounted amounts based on contracts with Cigna or Repricing Companies that do not actually exist or at amounts not agreed to under the few global agreements between Repricing Companies and individual Plaintiffs; (c) Cigna provides savings to Cigna Subscribers by negotiating discounts with providers, such as Plaintiffs, and as a result, the Cigna Subscribers owe little or nothing on an out-of-network provider claim; and (d) large portions of the out-of-network provider claims are not covered and that Plaintiffs must negotiate with Repricing Companies and accept drastic underpayments for amounts due and owing under the terms of the Cigna Plans.

App. 172–73. As a result of these practices, Cigna has deprived the Practices of "money and property, including money due and owing to [the Practices] under the Cigna Plans; and unnecessary time and administrative expense seeking to obtain payments to which they are already entitled under the Cigna Plans." App. 173.

7

The Practices further allege that Cigna engaged in "multiple acts of embezzlement, theft, or unlawful conversion or abstraction" of Plan assets, App. 100, including by diverting funds owed to the Practices from the Cigna Plans' bank to Cigna's own interest-bearing bank account.

**II**

The Practices sued Cigna in 2019 and then thrice amended their complaint. The District Court dismissed the second amended complaint in full. That dismissal was without prejudice as to the ERISA claims (to recover benefits due under the Plans and for violations of fiduciary duties) and the RICO claims, but it was with prejudice as to two state law claims currently on appeal: quantum meruit and violations of New Jersey's Health Claims Authorization, Processing and Payment Act ("HCAPPA").

The Practices reasserted their ERISA and RICO claims in their third amended complaint.[4] In June 2024, the District Court dismissed the third amended complaint with prejudice. As to the ERISA claim to recover benefits, the District Court determined that the Practices "failed to sufficiently allege what their normal charges are, and have instead improperly conflated normal and full-billed charges." App. 21. Thus, it concluded that the Practices did not plausibly allege that they were underpaid in violation of Plan terms. Because the District Court had reached the same conclusion in its decision dismissing the second amended complaint, it determined that amendment would be futile.

As to the ERISA claims for violating the duties of loyalty and due care, the

---

[4] They also brought additional state law claims that are not at issue in this appeal.

8

District Court ruled that the Practices lack standing to seek disgorgement of profits related to the cost-containment fees because there was "no indication . . . that those funds themselves would have gone to [the Practices]," and thus, the Practices had not alleged any injury. App. 27. The District Court ruled that the Practices have standing to seek injunctive relief for violations of fiduciary duties, but the fiduciary-duty claims fail for the same reason as the claim to recover benefits: the Practices did not sufficiently allege that they were underpaid. The District Court dismissed the RICO claims for the same reason.

The Practices timely appealed.

**III**[5]

In their appellate brief, the Practices challenge the dismissal of the ERISA and RICO claims from the third amended complaint and the quantum meruit and HCAPPA claims from the second amended complaint.

---

[5] The District Court had jurisdiction over the ERISA and RICO claims pursuant to 28 U.S.C. § 1331, and it had supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), applying the same standard as the district court. *Rivera v. Monko*, 37 F.4th 909, 914 (3d Cir. 2022); *Morrow v. Balaski,* 719 F.3d 160, 165 (3d Cir. 2013) (en banc). This means we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citation modified).

9

## A

To state a claim under ERISA "to recover benefits due to [them] under the terms of [the Plans]," 29 U.S.C. § 1132(a)(1)(B), a plaintiff "must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan." *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006).

The District Court determined that the Practices did not plausibly allege that benefits were due to them because they conflated their billed charges with their normal charges. It explained that, because the same figures labeled "normal" charges on a spreadsheet attached to the third amended complaint had been labeled "incurred" charges in a previous version of the complaint, the provided numbers must be the Practices' *billed* charges, not their normal charges. App. 22. It also pointed out "unexplained variations between the listed charge by providers for the exact same billing code," and it reasoned that these "discrepancies" mean the Practices did not plausibly plead their normal charges. App. 22–23. We disagree.

On a motion to dismiss, we must accept as true the Practices' allegations regarding their normal charges and draw all inferences in their favor. At this stage in the litigation, the Practices' allegation that they billed Cigna their normal charges, which were in turn set at the 80th percentile of the FAIR Health database, sufficed to establish their normal charges for purposes of the MRC-1 methods. As for the District Court's concerns about unexplained variations in charges for the same billing code, the four examples cited by the District Court involve just eight claims out of the 1,677 claims at issue in this

litigation. Drawing all inferences in the Practices' favor, these limited discrepancies do not require dismissal.[6]

The Practices have sufficiently alleged that the MRC-1 method required reimbursement at the lesser of (1) the Practices' normal charges, as billed to Cigna; or (2) the 80–100th percentile of the FAIR Health database. Because the Practices allege that their billed amount *was* their "normal" charge; that the "normal" charge was set at the 80th percentile of the FAIR Health database; and that they were reimbursed at an amount short of the 80th percentile of the FAIR Health database, they have stated a claim as to MRC-1 Plans for which they are entitled to payment under ERISA.

By contrast, the Practices' allegations about reimbursements under the MRC-2 method fall short. Under MRC-2, reimbursement can be calculated using the first MRC-2 approach or the second MRC-2 approach. The Practices allege that Cigna never created the database contemplated by the first MRC-2 approach, so the first MRC-2 approach requires reimbursement of the Providers' normal charges. But the Plans permit an alternative: reimbursement under the second MRC-2 approach. And the Providers do not allege that Cigna failed to reimburse them as permitted by the second MRC-2 approach, which would be equally valid under the Plans. Without these necessary allegations, the Practices have failed to state a claim as to MRC-2 Plans.

---

[6] When opposing the motion to dismiss the third amended complaint, the Practices provided a declaration that similar inconsistencies were the result of typographical errors when transcribing procedure codes onto the claims spreadsheet.

The Practices' allegations regarding reimbursements for emergency claims are also insufficient. The example emergency-services Plan language states that the "allowable amount used in determining benefit payments for covered emergency services . . . is the negotiated amount agreed to by the Out-of-Network provider and Cigna, *or if no amount is agreed upon*," the greatest of three alternative calculation options. App. 113 (emphasis added). While the Practices allege that the greatest of the three alternative calculation methods is based on the MRC, and like the MRC-1 method, should result in reimbursements at the Practices' "normal" charges (i.e., the 80th percentile of the FAIR Health database), they do not allege the absence of negotiated amounts for the Practices' services. Because reimbursement for the negotiated amount would prevail over the MRC value, the Practices have not adequately alleged that they were entitled to reimbursement at their "normal" charges for emergency services.

Accordingly, we will vacate the dismissal of the Practices' ERISA claim for recovery of benefits as to the MRC-1 Plans, but we will affirm the dismissal of that claim as to the MRC-2 Plans and the emergency-services reimbursements.

B

Under ERISA, "a participant, beneficiary, or fiduciary" may bring a civil action to "enjoin any act or practice which violates [ERISA], or . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). A plan fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to

12

participants and their beneficiaries; and defraying reasonable expenses of administering the plan." *Id*. § 1104(a) (citation modified). In so doing, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B).[7]

The Practices argue that Cigna breached the fiduciary duties of due care and loyalty when it worked with the Repricing Companies to make false representations that increase cost-containment fees and by using Plan funds for its own benefit. The Practices seek injunctive, declaratory, and equitable relief, including the removal of Cigna as Plan administrator and disgorgement of profits.

The Practices lack standing to bring any fiduciary duty claims related to cost-containment fees and the use of Cigna Plan funds, regardless of the type of relief they seek. Because "there is no ERISA exception to Article III," *Thole v. U. S. Bank N.A*, 590 U.S. 538, 547 (2020), a plaintiff must suffer a "concrete injury" to have standing to bring ERISA fiduciary-duty claims, *id.* at 544. Financial harm is a concrete injury that can establish standing for such claims, but "allegations that stand on nothing more than supposition cannot establish financial harm." *Knudsen v. MetLife Grp., Inc*., 117 F.4th 570, 580 (3d Cir. 2024) (citation modified). To establish an injury, the Practices needed to "show that they have an 'individual right' to the withheld [cost-containment fees and Plan] monies, such that, [Cigna's] purportedly unlawful retention of the monies harmed

---

[7] It is uncontested that Cigna was a Plan fiduciary and was therefore subject to ERISA fiduciary duties.

[them]." *Id.* at 582 (quoting *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 417 (3d Cir. 2013)).

The Practices have not made the necessary showing of a right to the cost-containment fees or other Plan funds. Although the cost-containment fees incentivized Cigna to negotiate to pay the Practices less, the Practices do not allege that they had a right to be paid more than the amounts that they negotiated with Cigna. Similarly, the complaint does not allege that the Practices had a right to any interest accrued on Plan funds in Cigna's bank accounts. So the Practices have not alleged a concrete injury stemming from Cigna's actions.

By contrast, the Practices have standing to bring their claim that Cigna breached its fiduciary duties when it fraudulently misrepresented that the Practices were not entitled to the full value of the claims accepted by the Plans. This theory is supported by non-speculative allegations of financial harm, so the Practices have standing to seek equitable relief in the form of an injunction or disgorgement. *See Knudsen*, 117 F.4th at 580 ("[F]inancial harm, "even if only a few pennies, is a concrete, non-speculative injury.") (citation modified). The District Court dismissed this claim based on its determination that the Practices did not allege their normal charges. Because we conclude otherwise with regard to the Practices' normal charges, *see supra* Section III.A, we will vacate the dismissal of the fiduciary-duty claim arising from Cigna's alleged misrepresentations.

On remand, the District Court shall consider in the first instance whether, as assignees, the Practices have standing to bring a claim for violations of fiduciary duties

under 29 U.S.C. § 1132(a)(3). *See Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 310 (3d Cir. 2008) (finding sufficient evidence to support finding that insurance company breached fiduciary duty owed to assignee, a healthcare provider).

C

The District Court dismissed the Practices' RICO claims on the grounds that, absent sufficient allegations that they were underpaid under the Plans, the Practices did not plead an injury for the purposes of RICO. Incorporating our discussion above, *see supra* Section III.A, we will vacate the dismissal of the RICO claims and remand them for further consideration.

D

The District Court held that the Practices' quantum meruit claim is preempted by ERISA and the HCAPPA claim fails because HCAPPA confers no private right of action. We agree.

A state law claim is preempted by ERISA where it is "premised on . . . the existence of a[n ERISA] plan." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990); *see* 29 U.S.C. § 1144(a). For example, claims may be preempted "where the court's inquiry must be directed to the plan; where the existence of an ERISA plan is a critical factor in establishing liability; and where there simply is *no* cause of action if there is no plan." *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 230 (3d Cir. 2020) (citation modified).

Under New Jersey law, recovery for a quantum meruit claim requires "(1) the performance of services in good faith, (2) the acceptance of the services by the person to

15

whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.* at 241 n.27 (quoting *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 796 A.2d 238, 242–43 (N.J. 2002)). And the Practices' quantum meruit theory is that Cigna "drastically underpaid [them] and, therefore, has not reimbursed [the Practices] for the reasonable value of the treatment and services that [they] rendered to Cigna Subscribers." App. 419. Because the Practices' "expectation of compensation" is premised, at least in part, on the existence of the ERISA-governed plans, the quantum meruit claim is preempted by ERISA.

As for HCAPPA, the statute contains no express private right of action, but the Practices argue that a private right of action is implied. Because we lack "a definitive ruling" by the New Jersey Supreme Court on whether an implied private right of action exists, "we must predict how that court would rule if faced with the issue." *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011) (citation modified).

Under New Jersey law, to determine whether an implied private right of action exists, courts consider whether:

> (1) plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy.

*R.J. Gaydos, Ins. Agency, Inc. v. National Consumer Ins. Co.*, 773 A.2d 1132, 1143 (N.J. 2001).

New Jersey courts are "reluctant to infer" private rights of action. *Id.* at 1142. In the insurance context, they will not do so absent "discernable legislative intent to authorize a private cause of action in a statutory scheme that already contains civil penalty provisions." *Id.* at 1145. We are unpersuaded by the Practices' argument that such a discernable legislative intent is present here. The Practices point only to the reference to "judicial or quasi-judicial proceedings, including arbitration" three times in the HCAPPA. *See* N.J. Stat. Ann. 17B:26-9.1(d)(10)(a), 17B:27-44.2(d)(10)(a), 26:2J-8.1(d)(10)(a). But they give short shrift to the HCAPPA's detailed mechanism for binding arbitration. *See* N.J. Stat. Ann. § 17B:26-9.1(e)(2). Due to the legislature's inclusion of that arbitration mechanism, and the absence of discernable legislative intent to authorize private litigation, we do not predict that the New Jersey Supreme Court would recognize an implied private right of action under the HCAPPA.

\* \* \*

For the reasons set forth above, we will AFFIRM the District Court's order dismissing the state law claims from the Practices' second amended complaint, AFFIRM IN PART and VACATE IN PART the District Court's order dismissing the Practices' third amended complaint, and REMAND for further proceedings.

17